BOWMAN BISCUIT COMPANY OF TEXAS V. A. C. HINES.

No. A-3298. Decided July 16, 1952.
Rehearing overruled October 1, 1952.
(251 S. W., 2d Series, 153.)

*Leachman, Matthews & Gardere,* of Dallas, for appellant, Bowman Biscuit Co. of Texas.

*Justice, Moore & Justice,* of Athens, for Appellee, A.C. Hines.

MR. JUSTICE SMITH delivered the opinion of the Court, on rehearing.

On July 3, 1951, the Honorable Court of Civil Appeals for the Fifth Supreme Judicial District of Texas, through the Honorable Joel R. Bond, Chief Justice, certified to this court for adjudication and answer the following question:

"Where the ultimate consumer of food, sold in the original sealed package for human consumption, suffers injury and damage from such food being contaminated, is the wholesaler, or middleman, as well as the manufacturer and retailer, liable to such ultimate consumer for damages proximately resulting to him by reason of the eating of such food, under an implied warwanty imposed by law as a matter of public policy?"

On original hearing the above certified question was

answered in the affirmative in an opinion by Associate Justice Garwood joined by Associate Justices Sharp, Brewster, Griffin and Wilson. Chief Justice Hickman and Associate Justices Smedley and Calvert joined Associate Justice Smith in a dissenting opinion holding that the question should be answered in the negative.

On rehearing, Associate Justice Wilson has this day delivered an opinion concurring with the view that the question should be answered in the negative; therefore, the motion for rehearing is granted and the certified question is answered "No."

Opinion delivered July 16, 1952.

MR. JUSTICE WILSON concurring.

The certified question should be answered in the negative.

On the original submission both opinions took the position that there was little or no distinction between the liability of the retailer and that of the wholesaler. I felt that under Griggs Canning Co. v. Josey, 139 Texas 623, 164 S. W. 2d 835, 142 A.L.R. 1424, and dicta in Decker & Sons v. Capps, 139 Texas 609, 164 S. W. 2d 828, 142 A. L. R. 1479, the implied warranty based upon public policy extended to all selling food. Upon rehearing I have decided that the broad liability of an implied warranty based upon public policy should not be extended beyond limits necessary to satisfy that public policy. The question of whether to follow or overrule the Griggs case is not before us. The question at bar is whether or not a wholesaler should be directly liable to the consumer.

The reasoning used in either case does not apply to the wholesaler. As to him, there is no sale between him and the consumer to support the rationale of the Griggs case. Neither does the rationale of the Decker case fit his situation since there is neither opportunity to know and control the contents of the sealed package nor representations or inducements made by him to the consumer. The case of Walker v. Great Atlantic & Pacific Tea Co., 131 Texas 57, 112 S. W. 2d 170, 172, was expressly based upon the retailer's conduct. The court said:

"* * * The can of corn was so labeled as to conceal from the buyer the identity of the manufacturer. This conduct in legal effect put the retailer in the place of the manufacturer."

The record at bar does not disclose either the wording of

the label or the name of the manufacturer. This suit was filed on the theory that the defendant was the manufacturer. In response to request for admissions it developed that the defendant was a wholesaler.

Our food distribution system has in recent years undergone a great change. The function formerly performed by the broker and wholesaler has in many instances been taken over by the retail chain stores, or by buying cooperatives or associations. Wholesalers have organized retail outlets under many different patterns. The different situations of the middlemen are so varied and complex that each should be governed by his own contract.

Under a second consideration of this case I find no impelling reason to extend to a wholesaler a direct liability to the consumer. There is little basis in the common law and none under Rule 38,*T.R.C.P. The question here does not involve the possible ultimate liability of this wholesaler if impleaded by the retailer, but whether he is liable in a direct action. Any attempt to overrule the Griggs case in the proceeding at bar would be dicta.

Opinion delivered July 16, 1952.

MR. JUSTICE GARWOOD, joined by Justices Sharp, Brewster and Griffin, dissenting.

Due to the action taken on rehearing, the following, which was heretofore the opinion of the court, now represents the views of a minority of the justices, but is filed in its original form, instead of in the form of a dissent, for convenience. Justices Sharp, Brewster and Griffin concur herein, Justice Brewster largely for the reason that the legislature has taken no action since the decision in Griggs Canning Co. v. Josey, infra, toward changing the law as therein declared.

The question, certified by the Dallas Court of Civil Appeals, 240 S.W. 2d 467, 468, arises on a plea of privilege of the defendant-appellant, Bowman Biscuit Company of Texas, in a personal injury suit filed in Grayson County by A. C. Hines. The alleged injuries of the plaintiff-appellee, Hines, were caused by swallowing a wire in an "appricot puff" cooky purchased in a sealed celophane package by his wife from their retail grocer, who in turn had purchased it in the same package from the defendant-

appellant as wholesaler or "middleman." Except as might legally result from the bare fact of an ordinary sale, no negligence of the defendant-appellant nor anything approaching an express warranty of the goods is involved. The question reads:

"Where the ultimate consumer of food, sold in the original sealed package for human consumption, suffers injury and damage from such food being contaminated, is the wholesaler, or middleman, as well as the manufacturer and retailer, liable to such ultimate consumer for damages proximately resulting to him by reason of the eating of such food, under an implied warranty imposed by law as a matter of public policy?"

The assumption, which the question makes, of established liability of the retailer and manufacturer is, of course, due to our own clear and studied holdings to that effect in Griggs Canning Co. v. Josey, (1942) 139 Texas 623, 164 S.W. 2d 835, 142 A.L.R. 1424, and Decker & Sons, Inc. v. Capps, 139 Texas 609, 164 SW. 2d 828, 142 A.L.R. 1479. To those decisions, and especially the broad rule therein stated by the late Chief Justice Alexander, who wrote the opinions, as well as to certain language from a Missouri case quoted by Judge Martin of our Commission of Appeals in Walker v. Great Atlantic & Pacific Tea Co., 131 Texas 57, 112 S.W. 2d 170, is also due the tentative opinion of the Court of Civil Appeals in the instant case, favoring an affirmative answer to the question certified as against a possibly contrary view derivable from earlier decisions of other Courts of Civil Appeals in Needham v. Dial, 4 Texas Civ. App. 141, 23 S.W. 240, Houk v. Berg, Tex. Civ. App., 105 S.W. 1176, and Jax Beer Co. v. Schaeffer, Tex. Civ. App., 173 S.W. 2d 285.

In the Griggs Canning Co., case there was no proof of negligence or express warranty on the part of the defendant retailer. In the Decker & Sons, Inc., case the manufacturer of the impure canned goods was not negligent and had no contract with the injured consumer whose husband had purchased them from a retailer. Our earlier decision in the Walker case adopted the opinion of the Commission of Appeals holding the non-negligent retailer liable to the injured consumer on facts identical to those of the Griggs Canning Co., case except that the label on the can in the Walker case did not disclose the identity of the manufacturer, though it did plainly indicate the retailer to be merely "Distributors."

The rule of liability as stated in the Griggs Canning Co., and Decker & Sons, Inc., decisions, and indeed the whole philosophy

of the opinions in those two cases would include allowing the consumer his action against the wholesaler as well as against the manufacturer and retailer. Furthermore, since we have held the nonnegligent manufacturer liable without any basis in contract and have also held the nonnegligent retailer, it appears to be only a logical step to allow the consumer an action against the wholesaler. The retailer held liable to the consumer obviously ought to have a recovery over against the wholesaler, and if that is so, there seems no good reason not to let the consumer attack the wholesaler in the first instance and without benefit of contract, just as we allow him to attack the manufacturer. No doubt the wholesaler held liable to the consumer or to the retailer should in turn be allowed to shift liability onto the manufacturer.

While few reported cases from other states appear to present the narrow point of liability of the wholesaler as distinguished from that of the retailer or manufacturer, the holdings in Nelson v. West Coast Dairy Co., 5 Wash. 2d 284, 105 P. 2d 76, 130 A. .L. R. 606, and Swengel v. F. & E. Wholesale Grocery Co., 147 Kan. 555, 77 P. 2d 930, support our conclusion above stated. A contrary view is taken in Degouveia v. H. D. Lee Mercantile Co., 231 Mo. App. 447, 100 S.W. 2d 336, the opinion in which was quoted in our Walker case abovementioned, in so far as it favored liability of the retailer, the latter point being the one at issue in the Walker case. However, the approved quotation from the Degouveia case included the statement that a retailer held liable to the consumer would, as a matter of course, have redress over against the wholesaler, and as before stated, we see no great difference between that proposition and allowing the consumer to proceed against the wholesaler in the first instance.

Up to this point, that is to say, the point that liability of the retailer as determined in the Griggs Canning Co., case (which we will hereinafter refer to as the "Griggs Case") logically entails liability of the wholesaler, there appears to be no divergence of views among ourselves. Doubtless we are also unanimous that, had that decision gone the other way, the the liability of the defendant-wholesaler in the instant case would be very doubtful. But a large minority of the court feels that the Griggs case is such bad law that, though it is neither old enough to be at all obsolete nor new enough to be yet unfamaliar to the bar or the legislature, it should now be repudiated; and therein lies our only controversy.

The practical application of *stare decisis* in so far as that term means adherence to earlier decisions (see Green, *The Development of the Doctrine of Stare Decisis and the Extent to Which It Should Be Applied,* Ill. L. Rev. Vol. XL, p. 303) has, of course been the subject of too much and varied opinion to permit of yet another commentary here. For present purposes, we may probably take it safely to mean that we should be very reluctant to overrule our own decisions unless we have somewhat more than ordinary reason to consider them wrong as of the day they were rendered or good reason to believe that subsequent events have made them obsolete. Clearly, a rule laid down by our court of yesterday is not to be repudiated today simply because today's judges think they would have reached a different conclusion had they constituted the earlier court. Other reason, such as substantial criticism by the bar, respected law writers or courts of other jurisdictions should ordinarily enter the picture. So also, in a proper case, should the attitude of the legislature, which may be expressed either by action or inaction and can usually be relied on to rectify judicial aberrations not in the public interest. And if we of today should feel inclined to repudiate a prior decision relying altogether on such peculiarly subjective matters as our own ideas of logic and intelligent appreciation of specific precedents, as contrasted with those of the earlier court, should we not refrain from so doing unless the judicial technique of our predecessors in the particular case seems not merely erroneous, but unusually deficient? Judged by these general standards, it is felt that the question of whether the Griggs case is to be overruled is not even a close one.

That there was a dissent in the Griggs case does, no doubt, make a difference, but, of course, only one of degree, while it must also be remembered that dissents under some circumstances—and these existed in the Griggs case—tend to emphasize the deliberateness with which the majority conclusion was reached. The dissent in question was but a less elaborate statement of the same argument advanced today, which seems to be primarily that the decision was and is in defiance of what is said to be the "majority rule" or "weight of authority."

By that is meant purely common or decisional law on the point at issue, because it must be, and seems to be, conceded that even ten years ago, under the warranty provisions of the Uniform Sales Act, which was rather generally in force, practically all of the quite substantial number of decisions involv-

ing retail sales of impure packaged food held the nonnegligent retailer liable in damages to the consumer. It appears to be argued that all these decisions but emphasize the more or less arbitrary character of the Griggs decision in that the latter, so to speak, put the Sales Act into effect in Texas by judicial means. Assuming what may well be doubted, that such a step, if taken, would necessarily and always be flagrant judicial heresy, the argument is yet beside the point, because, as is quite clear from the opinion in question, the decisions under the Sales Act were cited for an altogether different purpose. Before the corresponding provision of the act could apply, it was necessary for the courts themselves to decide whether the consumer did indeed rely on the skill and judgment of the retailer with respect to packaged goods. The statute merely imposed liability *if* he relied. The courts held that under circumstances similar to those of the Griggs case the consumer should be presumed so to rely. This purely judicial conclusion, reached without aid of the statute, that in the ordinary retail sale of packaged goods the purchaser relies upon the skill and judgment of the seller, appears to be authority as relevant as it is undoubtedly abundant upon the question presented in the Griggs case and for the holding which this court made therein. Considering that we are not dealing with the question for the first time but with the matter of whether our own solemn adjudication was so very wrong that it should now be repudiated, the Sales Act decisions alone might well be enough basis for this opinion. Where it has been determined—as a matter of judicial rather than legislative decision—that the buyer relies on the retailer's skill and judgment, surely it would be no very radical step thence for a court to impose liability on the retailer, even though there were no statute requiring it to do so. The conspicuous refusal of courts generally, in applying the Sales Act, to hold that the buyer relies less on the seller in the case of packaged food than he does in the matter of unpackaged food is not to be ignored as a matter of general law. See Bonenberger v. Pittsburgh Mercantile Co., 345 Pa. 559, 28 A. 2d 913, 143 A.L.R. 1417, and Martin v. Great Atlantic & Pacific Tea Co., 301 Ky. 429, 192 S.W. 2d 201, as recent examples.

But wholly aside from the Sales Act decisions, any suggestion that this court flouted precedent in the Griggs case is far indeed from well founded. Where the number of relevant decisions is quite small, or where opposing decisions are not conspicuously out of balance, it is inaccurate in any case to speak of a "majority rule," and be it said to the credit of the

digest, which is cited as being against the conclusion reached in the Griggs case, that its text does not use such a broad term. Not a great many courts have actually passed on the exact question, and it neither can be nor is disputed that various of these decisions clearly support the Griggs holding. Even should it be that those on the other side preponderate by one or two out of, say ten, such a situation hardly calls for a repudiation of our decision, which the opinion discloses to have given consideration to the cases in conflict with it. But let us again muster the decisions in question.

For upholding our decision, we cite (or re-cite) : Sencer v. Carl's Market (Fla.), 45 So. 2d 671 (a clear holding on the very point, though admittedly accompanied by a dissent) ; Chapman v. Roggencamp, 182 Ill. App. 117, and Sloan v. F. W. Woolworth Co., 193 Ill. App. 620, (both cited in the Griggs opinion and apparently admitted to hold as stated) ; Swengle v. F. & E. Wholesale Grocery Co., 147 Kan. 555, 77 P. 2d 930 (admittedly in point) ; Cushing v. Rodman, 65 App. D.C. 258, 82 F. 2d 864, 104 A.L.R. 1023; Degouveia v. H. D. Lee Mercantile Co., 231 Mo. App. 447, 100 S.W 2d 336 (admittedly in point) ; and our own abovementioned decision in Walker v Great Atlantic & Pacific Tea Co., 131 Texas 57, 112 S.W. 2d 170.

As against the above are the decisions from Georgia, Kentucky, Maine, Mississippi and New York, which are alleged to constitute a "majority rule" and will be further mentioned hereinafter.

On those which we cite above without parenthetical comment, the following observations are in order.

They, like the others, have no concern with the Sales Act and all involve holding a nonnegligent retailer as the result of his sale of packaged food or its equivalent.

As to the Degouveia case and our own Walker case: The former we have already mentioned as being opposed to the unanimous view of our present court that direct liability of the wholesaler would be a logical consequence of liability of the retailer. In that case the wholesaler escaped liability for the sale of the can of impure salmon, though the wholesaler's name and it alone was on the label. But the retailer was held. And the court's statement rejecting the retailer's argument of lack of negligence or opportunity to know the contents of the can was

quoted in our own Walker case and in it said to be followed as authority for rejecting a similar plea of a retailer. In the Walker case some importance was, it is true, attached to the fact that the label on the can, while giving the identity of the defendant retailer as a mere "distributor," did not tell who the manufacturer was. But if anything at all is clear from that decision, to which the dissenter in the Griggs case gave his approval at the time, it is that the retailer was held liable without negligence or means of knowledge regarding the condition of the food and without having mispresented itself as the manufacturer. If it was outrageous in the Griggs case for us to hold the retailer, then it was scarcely less so to hold him as we unanimously did in the Walker case, the only difference being that in the latter he failed to put the manufacturer's name on the can, which misled no one.

Cushing v. Rodman—like the Maine case, (Bigelow v. Maine Cent. R. Co., 110 Me. 105, 85 Atl. 396, 43 L.R.A. N.S. 627) which is the leading authority against retailer liability—was a restaurant type of case, but more similar to the usual retailer situation in that the damage was done, not as in the Maine case by food taken from a can by the seller and then served, but by a roll containing a pebble which must have gotten into it at the bakery and could not possibly have been discovered by the lunchroom operator without destroying the roll itself. That elaborately considered decision, which held the lunchroom operator liable, and was duly cited in the Griggs case, points up, among other things, the impractical aspect of the alleged "majority rule" against retailer liability for food in "the original package." That supposed great difference between packaged and unpackaged food is claimed to be good ground for ruling out as authority a number of older decisions, which held the nonnegligent retailer at common law on facts involving unpackaged food, and which we have accordingly refrained from including in the list above. But one may well ask whether there really is such a significant difference, for example, between a sound-looking and smelling piece of meat with a poisonous germ or drug hidden in its tissues and on the other hand impure food contained in a package or even a can. The practical opportunity for discovery by the retailer is scarcely greater in one instance than in the other, especially in the case of the small merchant, who seems to be sued rather seldom, but for whose welfare apprehension is expressed. If he is properly held without negligence in the case of unpackaged food, is it any great step hence to hold him in the case of packaged food? The various decisions

imposing retailer liability without negligence in the case of unpackaged food are, therefore, relevant, although we consider the Griggs decision too well supported without them to refer to them again in detail here. They seem admittedly to reflect the "general rule" to which the alleged "majority rule" denying liability in respect of packaged food is an "exception."

At this point mention should no doubt also be made of Ward v. Great Atlantic & Pacific Tea Co., 231 Mass. 90, 120 N.E. 225, 5 L.R.A. 242, since it is quoted in the Griggs case and the reference is now challenged as somehow improvident or misleading. The Griggs opinion, of course, plainly states that the Ward case was one under the Sales Act, as it did with regard to every such case which it cited. It was clearly not cited as passing directly on the packaged goods question under the common law, but rather for the special, yet quite relevant, propositions that: (a) Subdivision 1 of Section 15 of the act (warrant of fitness where the buyer relies on skill and judgment of the seller) is nothing but a codification of the common law; (b) There is a general common law principle that in sales of "food" its fitness is taken as warranted by the seller; (c) This latter principle properly included a sale of canned food by a retailer who has purchased it in the can from another, just as it includes sales of unpackaged foods. The Ward case undoubtedly states just that and, being decided some twenty-five years before the Griggs decision, is undoubtedly a proper, if small, part, of the considerable body of law generally going to justify our Griggs decision. It, like the recent Sales Act decisions in Bonenberger v. Pittsburgh Mercantile Co., supra, and Martin v. Great Atlantic & Pacific Tea Co., supra, emphasizes the refusal of courts, in determining whether the buyer relied on the skill and judgment of the seller for the purposes of the Sales Act, to draw any distinction between packaged and unpackaged food.

Nor is it correct to suggest that the Griggs case placed any particular reliance upon Ryan v. Progressive Grocery Stores, 255 N. Y. 388, 175 N.E. 105, 74 A.L.R. 339. That decision was expressly described as a Sales Act case and was mentioned no doubt because of its prominence in texts and digests among that class of decisions. The little that was said about it is indisputably correct, to wit, that it "approved the decision of the Massachusetts court in Ward v. Great Atlantic & Pacific Tea Co., supra, as applied to cases where the selection of the goods is made by the dealer, and held that where the buyer selects the brand and does not rely on the skill and judgment of the

dealer there is an implied warranty of merchantable quality under Subdivision 2 of Section 15 of the Sales Act. (139 Texas 623, 164 S.W. 2nd 837)."

And in considering this portion of the Griggs opinion, we must also observe that it is not properly to be charged with unfounded innuendos as to the holdings in certain earlier decisions rendered in New York and elsewhere prior to adoption of the Sales Act and not actually involving packaged goods. What was meant, as is rather plain from the citation of several of these same cases in the previous portion of the opinion, is simply that "the general rule" of warranty or nonnegligent liability, that seems admittedly to have long existed with regard to "food", did not require for its application that the buyer be shown to have relied on the skill and judgment of the retailer or other seller, as is required by the terms of Subsection 1 of Section 15 of the Sales Act. From this it was reasoned with some force that the Sales Act is actually restrictive of the common law, and from this in turn that, generally speaking, decisions holding the retailers liable under Subsection 1 indicate a tendency of courts to impose liability in the case of retail sales of food, regardless of the act itself. Putting it another way, the only application of the argument in question to packaged goods was this — that if the Sales Acts courts had felt it at all unjust to charge the retailer in an ordinary nonnegligent retail sale of such goods, they surely would not have held as unanimously as they have that the buyer relied on the retailer's skill and judgment, so as to charge the latter under the act. Indeed, as before stated, to hold (in order for the act to apply at all) that in an ordinary retail sale of packaged goods the consumer relies, or is presumed to rely, on the skill and judgment of the retailer comes rather close to holding that the retailer ought to be liable even without the act, which makes reliance the test.

Now as to the holdings from some five jurisdictions, which are said to constitute the "majority rule" of the common law, denying liability of the nonnegligent retailer in sales of packaged food, as opposed to the contrary holdings on similar facts which we have specially listed from at least five jurisdictions in support of our Griggs decision: As before stated, substantially all of these alleged "majority rule" decisions were expressly acknowledged, though not followed, in the Griggs case. As to Bigelow v. Maine Cent. R. Co., 110 Me. 105, 85 A. 396, 43 L.R.A. N.S. 627; Pennington v. Cranberry Fuel Co., 117

W. Va. 680, 186 S.E. 610; and Kroger Grocery Co. v. Lewelling, 165 Miss. 71, 145 So.. 726, we add no comment. As to the case of Julian v. Laubenberger, 16 Misc. Rep. 646, 38 N.Y.S. 1052, the New York pre-Sales Act rule, as said to be stated in that decision, seems to mean that if the buyer were ignorant of the fact that the seller was not the manufacturer or the further fact that the seller had not somehow inspected or come to know the contents of the can, then the seller would be liable. Considering how freely and informally canned goods are purchased in these modern times, this would seem almost the same as saying that the retail seller would usually be liable. As to Walden v. Wheeler, 153 Ky. 181, 154 S.W. 1088, and Scruggins v. Jones, 207 Ky. 636, 269 S.W. 743, while no doubt they do reflect the law as it was before Kentucky adopted the Sales Act, one can hardly read the later decision of Martin v. Great Atlantic & Pacific Tea Co., supra, holding the retailer liable after the act, without acquiring an impression that the court thought he ought to have been liable from the beginning. Why otherwise should the opinion refer with apparent approval to the Griggs case and make the argument that it was on the whole better policy to hold the retailer and let the latter recover over against the wholesaler or manufacturer? 192 S.W. 2d 201,203.

As to Fleetwood v. Swift & Co., 27 Ga. App. 502, 108 S.E. 909, it and similar Georgia decisions seem to have been discarded by the Supreme Court of that State in Donaldson v. Great Atlantic & Pacific Tea Co., 186 Ga. 870, 199 S.E. 213, 217, 128 A.L.R. 456, which held in effect that under the state pure-food laws, which are substantially the same as our own and were evidently in effect when the Fleetwood case was decided, the defendant retailer would be liable on the basis of negligence *per se* for injuries from the sale of contaminated meat, and that for such liability it was unnecessary "for (him) to have had 'knowledge of the impurity of the food, or to have been wanting in ordinary care in connection with its sale.' " The court said further: "Nothing to the contrary was actually decided in any of the following cases: Fleetwood v. Swift, 27 Ga. App. 502, 108 S.E. 909 * * *. In none of these cases was there any reference to the pure-food act; and whether under the facts or any one or more of them this statute could have been invoked, these cases can be considered as physical precedents only, with little or no force as authority, in relation to such statute."

It therefore appears that, in defending the Griggs decision, if we restrict ourselves even to precedents which do not in any

way involve the Sales Act and which do involve the retail sale of only packaged food brought by the defendant-retailer from a wholesaler or manufacturer, there is far from being such a "weight of authority" against the Griggs decision as to make it appear clearly wrong as an original proposition, much less to justify us in repudiating it after having carefully considered and decided it. And if we give weight—as we should—to relevant principles decided by courts in the course of applying the Sales Act, or if we treat as a persuasive fact—as well we might—the rather impressive number of jurisdictions which by the Sales Act and by common law have a policy of holding the retailer responsible, without negligence or express warranty, in the sale of impure packaged food, the Griggs case may be said rather to have brought our state better into line with prevailing views of justice rather than to have defied the latter.

And there is yet another class of decisions to be mentioned, though it was not directly adverted to in the Griggs case. It will be recalled that our own Walker case, in rejecting the contention that it was wrong to hold the more or less innocent retailer, referred at length to our criminal statutes penalizing the sale of impure food, that portion of the opinion being not unnaturally quoted in the Griggs opinion, since the entire Walker opinion had been theretofore adopted by this court. It is true that the Walker opinion made a somewhat less than accurate statement as to the matter of *scienter* in connection with criminal liability under our pure food statutes. But it is still less accurate to say that our pure food laws are or were interpreted by the Court of Criminal Appeals as requiring *scienter* on the part of the dealer as an essential ingredient of the offense. It is true that by the general terms of Art. 41 of the Penal Code, mistake of fact is a defense to prosecution for many offenses, including violation of the pure food laws. It is also true that by the terms of those laws the possession by the seller of a written guarantee from the party who sold to him will prevent a conviction. But it is certain that *scienter* need not be alleged in the indictment, because it is not a part of the offense and only becomes relevant as a defense under the general article regarding mistake of fact. Actually this was what the old case of Vaughan v. State, 86 Texas Crim. Rep. 255, 219 S.W. 206, stated, as appears from the opinion on rehearing. See the recent contemporaneous decisions of the Court of Criminal Appeals beginning with Neill v. State, Texas Crim. App., 225 S.W. 2d

829, in which Vaughan v. State is explained. From these decisions it seems to follow that where the state proves the sale by the defendant of impure food even in a can, a case is made which would uphold a conviction. And it could hardly be otherwise considering the categorical terms of Art. 717, P.C. that "It shall not be necessary for the indictment to allege or for the State to prove that the act or omission was knowingly done or omitted." Admittedly the terms of our pure-food laws, like those of various other states and the United States, do not even suggest the exception in favor of packaged food, which is erroneously claimed to be "the majority rule" of the common law in civil cases. It is common knowledge that under both our state and federal laws, moreover, impure or misbranded canned food, may be judicially condemned at suit of the public authorities whether the dealer bought it innocently or not. As indicating that most cases treating the point hold *scienter* not to be a necessary element of the offense under the pure food laws, see the annotation in 152 A.L.R. 755.

The recent Georgia case of Donaldson v. Great Atlantic & Pacific Tea Co., 186 Ga. 870, 199 S.E. 213, 128 A.L.R. 456, as heretofore stated, held a retail seller of impure unpackaged meat guilty of negligence *per se* by reason of pure food laws substantially the same as our own, and in so doing expressly ruled that the plaintiff consumer, to make his case, need not allege or prove either that the defendant had no written guarantee from the wholesaler or manufacturer or that the defendant was lacking in ordinary care or had knowledge of the impurity of the food. The court conspicuously did not say that in the particular case the defendant "ought to have known" because of the nonpackaged character of the goods. It said in effect that he was liable even if he did not know and even if he exercised due care.

To the same effect is the rather late decision of the Supreme Court of Ohio in Wolfe v. Great Atlantic & Pacific Tea Co., 143 Ohio St. 643, 56 N.E. 2d 230, only there the food was canned food sold as such. See also the cases collected in the annotation in 128 A.L.R. 464.

It may well be that courts should not mechanically, so to speak, impose civil liability where the act of the defendant violates a criminal statute of the state. But, on the other hand, they should certainly not disregard the statute altogether, es-

pecially where there are no civil judicial precedents of contrary import. See Morris, *The Role of Criminal Statutes in Negligence Actions,* 49 Columbia L. Rev. 21. We do not here hold that our Griggs and Walker decisions ought to have carried their reliance on the pure food laws further so as to rest on the negligence *per se* theory, nor by any means do we need now espouse that theory in order to maintain our decision in the Griggs case. But results are precedential guides no less than the theories propounded to justify them. And so in determining whether the Griggs decision was and is obviously bad law, we properly note in addition to all the other matters heretofore discussed, that the courts of several respected jurisdictions have reached the same result by means which we might have used as additional or alternative grounds.

Thus we are disinclined to treat as unworthy of *stare decisis* a decision, which is in accord with at least half of the decisions reached under substantially identical facts in other jurisdictions and the result of which is obviously far more in accord with the results reached one way and another throughout this nation and in England than a contrary result would be. This is especially true when, so far as appears, the decision in question has met with little or no criticism except from the dissenting minority here and, while standing as the law of this state for some ten years, has yet to be superseded by contrary action of the legislature.

It is no valid criticism that the phrase "public policy" occurs in the Griggs decision or that a concept of justice, described by such a term, is what may have motivated some of the cases on which the Griggs opinion relied. After all, what could possibly be more a rule of "public policy" than the rather unanimous one which holds a nonnegligent manufacturer liable to a consumer with whom he had no shadow of a contract? And evidently all that Chief Justice Alexander had in mind in using the term "public policy" was to forestall in this state the confusion which had arisen elsewhere from conflicting approaches to the problem based respectively on tort and contract. Since in the Decker & Sons, Inc., decision we unanimously discarded both tort and contract in determining the manufacturer to be liable to the consumer, and no one suggests that that opinion should be even modified, why should we not say, in holding the dealer, that we do so, not on narrow theories of tort or contract, but because it is right and in accord with modern legal thinking?

On the matter of principle, which, often enough, means "public policy," much has already been written pro and con, and we would not be justified in repeating it all here. Suffice it to say that if the rule of the Griggs case is morally unjust, or practically unsound, then so are the several decisions of other states which are just like it, many decisions under the Sales Act, the negligence *per se* decisions of several states and doubtless most of the pure food laws of the country, including our own. Dubious, too, would be our own decisions in the Walker and Decker & Sons, Inc., cases. The idea of absolute liability in special situations—and here we are dealing only with that of food for human consumption—is certainly nothing novel in the law. What is the ancient rule of *respondeat superior* but one of absolute liability, so far as any fault of the defendant-employer is concerned? It is simply a rule of liability judicially imposed on the employer's business as a matter of policy. To those who apparently regard the Griggs decision as a major hazard to the economic life of small grocers, it may be observed: that such of them as remain in this age of large enterprise, are, to judge by the reported cases, rarely sued; that there is no indication whatever that in the years since the Griggs decision was written these small grocers have suffered any particular hardship thereby; that if they had suffered a real economic discrimination through that decision, the legislature would doubtless have taken action about it, which it has not; that the liability in question, if imposed on the small grocer can, of course, be transferred by him to the manufacturer or wholesaler, against whom he is probably in a much better position to proceed than is the average injured consumer.

In consonance with the Griggs decision, and for the reasons given, the certified questions should be answered affirmatively, that is, to the effect that the wholesaler or middleman is liable under the conditions stated.

Opinion delivered July 16, 1952.

MR. JUSTICE SMITH, joining by Chief Justice Hickman and Justices Smedley and Calvert dissenting.

I most respectfully dissent from the opinion expressed by the majority in this case.

The opinion of the majority holds that if the non-negligent retailer may be held liable to the consumer, who has suffered injury and damage from food sold in the original sealed pack-

age, upon an implied warranty imposed by law, as this court decided in Griggs Canning Co. v. Josey, 139 Texas 623, 164 SW 2d 835, 142 A. L. R. 1424, then it would be unjust and without reason not to hold the wholesaler, or middleman, also liable to the consumer. I have no quarrel with this conclusion. My attack is posed against the major premise—the liability of the retailer.

When the opinion in the Griggs case was written, the Court was composed of three men, one of whom filed a vigorous dissent. Under like circumstances, this Court exercises its right to review the principles of law announced by the majority when the question later arises in other litigation. Federal Royalty Co. v. State, 128 Texas 324, 98 SW 2d 993.

The duty of this Court is, among other things, to predicate its decisions upon reasonableness, upon fairness, and most certainly upon actualities. In recognition of this duty, it necessarily follows that many decisions depend upon judicial notions of wise public policy when there are no decisions upon the point within the state, and other jurisdictions offer only an evenly balanced conflict in result. This was the exact situation confronting this Court when it passed upon the Griggs Canning Company case. The majority common law rule, at that time, was that the retailer was not liable, in the absence of negligence, for injuries sustained by the consumer as a result of deleterious foods in sealed container. 22 Am. Jur. 882, Sec. 99. The majority rule of the United States, due to the fact that the adoption of the Uniform Sales Act influenced the decisions in many states, was that the retailer was liable. Williston on Sales, 2d Ed. 242. Texas has not adopted the Sales Act. In the Griggs Canning Company case the Court was placed in the position of deciding which was the wiser course to follow. This dissent is upon the grounds that an erroneous choice was made.

The Griggs opinion cites a statement from Williston on Sales, stating that there is no reason for engrafting an exception to the liability of the retailer merely because the goods are packed in sealed containers. The following is to be found in Vol. 1, Williston on Sales, Rev. Ed., 622:

"It must be possible, however, to sell unmerchantable goods even if the seller is a dealer or manufacturer, and though the buyer either does not inspect the goods or his inspection in the nature of the case can reveal nothing because the defects are latent. The ordinary way to do this is for the seller expressly

to state that the buyer must take the goods as they are. *Any word or conduct tending to show that this was the intention of the parties will prevent a warranty from being implied . . ."*

This section indicates that no warranty can be implied where the purchaser, at the time he purchases the packaged goods, knows, or is charged with notice, that the retailer could not possibly have known the contents of the package.

Ward v. Great Atlantic & Pacific Tea Co., 231 Mass. 90, 120 N. E. 225, 5 A.L.R. 242 is cited in the opinion in the Griggs Canning Company case as a leading case supporting the view that the retailer is liable. The decision is based upon Section 15 (1) of the Uniform Sales Act which requires a reliance by the purchaser. Is it possible to infer that the dealer warrants that the contents of the can are wholesome, or merely that *so far as the dealer knows,* the contents are pure? As stated in Bigelow v. Maine Cent. R. Co. 110 Me. 105, 85 Atl. 396, (which has not been overruled since the adoption of the Sales Act by that state), "The plaintiff knew, or should be charged with the knowledge that the defendant could have no possible information concerning the contents of that can which she did not have. We know of no rule of law which will imply a warranty of that of which it is impossible for a defendant to know by the exercise of any skill, knowledge or investigation, however great. In other words, neither law nor reason require impossibilities."

Furthermore, the Ward case was based upon cases which were themselves not precedents, unless it be recognized that the true basis of the Ward case was that of public policy, and not technical warranty. Chapman v. Roggenkamp, 182 Ill. App. 117, followed by Sloan v. F. W. Woolworth Co., 193 Ill. App. 620, are both based upon public policy. Wiedman v. Keller, 171 Ill. 93, 49 N. E. 210 cited by the Chapman case, was based upon the grounds that the dealer had superior facilities for ascertaining the condition of the meat than did the buyer. Other cases relied upon by the Chapman case were suits against the manufacturer. Finally Jackson v. Watson, 2 K. B. 193, 16 Ann. Cas. 492, where the court did not indicate whether the dealer had sold packaged or open goods, relied upon Frost v. Aylesbury Dairy Co., 1 K. B. 608, where the same fact was not shown, and there was the showing that an express warranty had been made.

Ryan v. Progressive Grocery Stores, 255 N. Y. 388, 175 N. E. 105, 74 A. L. R. 339, another case relied upon in the

Griggs case, is based upon Subdivision 2 of Section 15 of the Sales Act. This section *imposes* a warranty regardless of the intention of the parties. Although modern authorities do not look to the intention of the dealer when imposing a warranty, Williston on Sales, Rev. Ed., Sec. 201, supra, they refrain to do so merely because the term is misleading, the real problem being the right of the buyer to rely. Disregarding the intention of *both* parties leads us to one conclusion. At most, Section 15 (2) of the Sales Act (which has been adopted by a vast majority of our United States) is a legislative pronouncement of the public policy of the state, or a judicially constructed and interpreted public policy, regardless of the soundness of that policy.

The majority opinion says it is not a "radical step" to *impose* liability upon a retailer of packaged goods, even in the absence of statute, since the courts under the Sales Act have made a "judicial" presumption that the consumer relied upon the "superior knowledge" of the retailer, refusing to make a distinction between packaged and open goods. As stated in McCormick and Ray on Evidence, p. 48, Sec. 31, "The courts and writers agree that the assumption (presumption) is required or permitted because of one or more of the following reasons to justify it: (1) human experience with such situations. (It is shocking to suppose that human experience leads one to the conclusion that the consumer relies upon a "superior knowledge" that has no basis in fact.) (2) It achieves a result which is socially desirable. (This dissent attempts to point out that there is no social desirability in condemning an innocent party by manufacturing a warranty based upon a "superior knowledge" *which can be shown does not exist to escape criminal liability in this state.*) (3) It serves as a procedual convenience." (This seems to be the true basis of the majority opinion, but it is not a just or sound foundation upon which to rest liability.)

The court in the Griggs case then implies that the rule holding the retailer liable under this set of facts was the same even before the Sales Act, citing Van Bracklin v. Fonda, 12 Johns, N. Y. 468, 7 Am. Dec. 339; Race v. Krum, 222 N. Y. 410, 118 N. E. 853, L. R. A. 1918F, 1172; Hoover v. Peters, 18 Mich. 51; Wiedman v. Keller, 171 Ill. 93, 49 N. E. 210. However, an examination will reveal that each of these cases involved either a situation where the retailer was the manufacturer, or the goods were exposed to the dealer's surveillance. As was stated in Bigelow v. Main Cent. R. Co., supra: "The early rules of law were formulated upon the theory that the provision dealer and

the victualer, having an opportunity to observe and inspect the appearance and quality of the food products they offered to the public, were accordingly charged with knowledge * * * No knowledge of the original or present contents of a perfect appearing can is possible in the practical use of canned products. They cannot be chemically analyzed every time they are used. Accordingly, the reason for the rule having ceased, a new rule should be applied to the sale and use of canned goods that will more nearly harmonize with what is *rational and just."* (Emphasis added). See also Julian v. Laubenberger, 38 N. Y. Supp., 1052. Clearly those cases dealt with the general rule and not the exception, and are not authority that will buttress the reasoning of the Griggs case.

The majority opinion states that there is not a significant difference between a sound-looking canned or packaged good and a piece of meat that has a poisonous germ or drug hidden in its tissues. This is a very unrealistic approach to the problem. The whole concept of police power of the state to control the sale and handling of impure foods is limited by due process. The reasonableness of the regulation is supported and governed by the desirability and the capability of the regulation to protect public health. The courts uphold such regulations, recognizing that many times hardship cases will arise, because the regulations instill, promote, and require the handlers of food to exercise the superlative degree of care in handling those commodities for human consumption. While the regulation would justly apply in the case of unpackaged goods, the reason falls where the goods are packaged. This dissent would be the first to hold a retailer liable who did not use the highest degree of care in inspecting the packaged goods for apparent defects, but we refuse to demand that, after he has done this, liability be imposed disregarding the limitation of reasonableness—a limitation which the criminal courts of this state respect. Because of this, we vigorously disagree with the conclusion of the majority that these decisions, concerning unpackaged goods, are relevant in even the smallest degree.

The Griggs case then cites the discussion of Texas Penal Statutes (involving food) found in Walker v. Great Atlantic & Pacific Tea Co., 131 Texas 57, 112 SW 2d 170. The discussion concludes that those statutes demonstrate an intent on the part of the Legislature to hold the retailer liable on the grounds of public policy. However, those statutes were interpreted, *prior to that decision,* by the Court of Criminal Appeals in Vaughn

v. State, 86 Texas Cr. Rep. 255, 219 SW 206, as requiring a wilfulness or knowledge on the part of the dealer before he is liable for prosecution.

The Court of Criminal Appeals' cases cited in the majority opinion clearly show that the public policy of this state is diametrically opposed to holding the retailer liable in the case at bar and in the Griggs case. These cases recognize that the defendant has a right to prove mistake of fact, and yet the majority is content to cite those cases in support of their conclusion that the public policy of this state is to impose liability (since scienter is not an element of an indictment), then disregards the limitation of reasonableness set out in those cases by casting aside the obvious defense of lack of knowledge.

Also, in connection with the Walker case, the majority opinion indicates that since the retailer did not have knowledge of the contents of the can, and since he was not negligent then the Walker case is some specie of authority for this case. As was stated in the Walker case, "The can of corn was so labeled as to conceal from the buyer the identity of the manufacturer. This conduct *in legal effect* put the retailer in the place of the manufacturer." (Emphasis added). Can it be argued that the element of induced reliance was absent in that case? We have no quarrel with that holding.

Degouveia v. H. D. Lee Mercantile Co., 231 Mo. App. 447, 100 S.W. 2d 336, is based upon an application of public policy.

In Swengel v. F. & E. Wholesale Grocery Co., 147 Kan. 555, 77 P. 2d 930, cited by the majority, the court did not seem to reach a result consistent with its reasoning. The court in that case stated that to relieve the retailer and middleman of liability merely because goods are packed in cans would practically relegate the consumer to his action against the manufacturer, since it must be recognized that today nearly every kind of commodity is sealed in containers. This, in the absence of negligence or implied warranty, is exactly what this dissent is advocating. For what reason did industry progress to this point but to meet the demand of the consumer-public to have his foods shipped from distant places at a low price, free from spoilage and filth? The court continued:

"It is also well known that many articles of food are sold by brand or name as a result of extensive advertising in which purity, wholesomeness, price, etc., are stressed in varying de-

grees, and that insofar as manufacturers, packers, and jobbers are concerned, the purpose is to challenge attention to the brand or name and to create a demand therefor. Insofar as the local dealer is concerned, he stocks and sells these advertised goods because of that demand."

This seems to say but one thing. The manufacturer, who is deemed liable under the decision of the Decker & Sons, Inc. v. Capps, 139 Texas 609, 164 S.W. 2d 828, 142 A.L.R. 1479, advertises and appeals to the consumer. The consumer puts faith in that advertising, creating a public demand for that food. The dealer heeds that public demand and stocks his shelves with what they seek. The court then reaches the conclusion that since the retailer does what is expected of him, he warrants the fitness or wholesomeness and is held liable. This appears to be unsound.

From a careful analysis of the cases involving the liability of the retailer, it is found that the only basis, if sound, for shifting the loss to the retailer is a "warranty" imposed by law on the grounds of public policy. It is elementary that the retailer is liable if he makes an express warranty. The implied warranty must have as its basis some reasonably inferred reliance, which I have attempted to show does not exist. Therefore, we are left with this one question: "Is there any reason for shifting the burden from the consumer to the retailer, merely because of his status?" I think there is a vast difference between the situation of the manufacturer and that of the retailer or wholesaler. The case of Decker & Sons, Inc. v. Capps, supra, decided by this Court on the same day it rendered its opinion in the Griggs Canning Company case, supra, was one in which the defendant was the manufacturer. The question to be determined was whether a manufacturer, who processes and sells contaminated food to a retailer for resale for human consumption, should be liable to the consumer for the injuries sustained by him as a result of the eating of such food. The exact question had not been before this Court at that time. The Court stated "there is quite a contrariety of opinion on the subject in other jurisdictions." In this connection, it appears that one of the reasons for the "contrariety" of opinion was the insistence on the part of several jurisdictions upon the requirement of privity in a suit upon the basis of warranty in food cases. In other words, some jurisdictions had held that the customer of a retailer could not recover even in food cases from the manufacturer or wholesaler unless he could prove negligence of the defendant. In the Decker case,

supra, this Court definitely, and I think correctly so, laid aside the requirement of privity for suit by the customer against the manufacturer and reached the conclusion the manufacturer was liable. Liability was based on the broad principle of the public policy to protect human health and life. An implied warranty was imposed by operation of law as a matter of public policy, and liability was not based on negligence, nor on a breach of the usual implied contractual warranty.

In reaching this conclusion, the Court said:

"It is a well known fact that articles of food are manufactured and placed in the channels of commerce, with the intention that they shall pass from hand to hand until they are finally used by some remote consumer. *It is usually impracticable, if not impossible, for the ultimate consumer to analyze the food and ascertain whether or not it is suitable for human consumption. Since it has been packed and placed on the market as a food for human consumption, and marked as such, the purchaser usually eats it or causes it to be served to his family without the precaution of having it analyzed by a technician to ascertain whether or not it is suitable for human consumption. In fact, in most instances the only satisfactory examination that could be made would be only at the time and place of the processing of the food."* (Emphasis added.)

The reasoning and ultimate conclusion reached is sound as applied to a manufacturer. It is clear that this rule of liability in respect to food prepared for human consumption is for the protection of the health of the people, and to insure a scrupulous care *in the preparation* of those articles of commerce so as to reduce to a minimum all danger to those using them.

In my opinion, the reason for the rule ceases completely and should not have been applied in the Griggs Canning Company case, supra, where the defendant was a dealer. In that case, the vendor was an innocent retailer. In the case now under consideration, the defendant is an equally innocent wholesaler. It sold to a retailer and the retailer in turn sold to the plaintiff a sealed package containing "apricot puff cookies." Plaintiff alleged injuries sustained by virtue of eating one of the cookies which had contained therein a piece of wire. The wholesaler had not prepared the sealed package. It was entirely ignorant of the presence of the wire in the cookie contained in the sealed package. I think it must be assumed that the plaintiff necessarily knew that the wholesaler and retailer had no superior knowledge

of the contents of the sealed package and that it was just as impossible and impractical for the wholesaler and retailer to analyze or inspect the sealed package as it was for the consumer to so ascertain whether or not it was suitable for human consumption. The law cannot be so unreasonable as to inject into a contract what neither party had, or could have had, in mind at the time the contract was made. It comports better with justice to hold that where a dealer sells to his customer an article in the original package in which it is put up by the manufacturer, and the customer knows as much about the article as the dealer or wholesaler, and buys it without any representation from the dealer or reliance upon his judgment, knowing that there has been no inspection of it by the dealer, there is no implied warranty, although the dealer knows that the customer buys it for food.

The situation of wholesaler-retailer and consumer is properly governed by the rules of negligence law. The retailer owes to the consumer the duty to supply goods packed by reliable manufacturers, and such as are without imperfections that may be discovered by an exercise of care, skill and experience of dealers in such products generally. This is the measure of the retailer's-wholesaler's duty. 11 R. C. L., Sec. 29, 1124; Bigelow v. Maine Cent. R. Co., 110 Me. 105, 85 Atl. 396, 398; 43 L. R. A. N. S. 627, 629; Walden v. Wheeler, 153 Ky. 181, 154 S.W. 1088; 44 L. R. A. N. S. 597; Scruggins v. Jones, 207 Ky. 636, 269 S.W. 743; Fleetwood v. Swift & Co., 27 Ga. App. 502, 108 S.W. 909; Pennington v. Cranberry Fuel Co., 117 W. Va. 680, 186 S. E. 610; Kroger Grocery Co. v. Lewelling, 165 Miss. 71, 145 So. 726; Julian v. Laubenberger, 16 Misc. Rep. 646, 38 N. Y. S. 1052.

The two Kentucky cases cited above were overruled by the Court of Appeals of Kentucky in the case of Martin v. Great Atlantic & Pacific Tea Co., 192 SW 2d 201, for the sole reason, as stated, they "were based upon the law as declared *before* the enactment in 1928 of our Uniform Sales Act. * * *" This strongly indicates that had it not been for the passage of the Uniform Sales Act, the Court would have adhered to its former decisions.

In the case of Foley v. Liggett & Myers Tobacco Co., Inc. et al, 241 N. Y. 233, 240, decided in 1930, the court, in discussing the case of Julian v. Laubenberger, supra, said:

"Prior to the Sales Act, it was held in Julian v. Laubenberger, 16 Misc. Rep. 646, 38 N. Y. S. 1052, that the seller was not

liable for food sold in sealed cases when it was known to the buyer that the seller had not prepared it, had not inspected it, and was ignorant of the contents of the can. This, however, is no longer the law of this state.

"Previous to the Sales Act, there was liability upon the manufacturer but not upon the dealer. The Sales Act, however, has brought about the change, for the Act expressly refuses to distinguish between manufacturers, growers, and dealers * * *."

Twelve years after the holding in the Foley v. Liggett & Myers Tobacco Company case to the effect that the law announced in the Julian v. Laubenberger case was no longer the law because of the enactment of the Uniform Sales Act, the New York court in the case of Hopkins v. Amtorg Trading Corporation, 265 App. Div. 278, 38 N. Y. S. 2d 788, held that the law announced in the Julian v. Laubenberger case must control in the absence of statute. In other words, the cause of action arose in the State of New Jersey, but the suit was filed in New York. The plaintiff failed to plead the statute of New Jersey as the foundation of his cause of action. The New York court simply held that in the absence of pleading and proving the law of the State of New Jersey, and further in the absence of sufficient proof as to the common law of that state, the common law of New York must govern. The court reached the conclusion that the retailer was not liable in the absence of proof of common law negligence. See also Kirkland v. Great Atlantic & Pacific Tea Co., 233 Ala. 404, 171 So. 735.

As to hidden imperfections, such as a small wire in a cookie in a sealed package, the consumer must be deemed to have relied on the care of the manufacturer or the warranty which is held to be implied on the broad principle to protect human health and life.

The wholesaler and retailer, when considered in their true light, are merely socially and economically desirable and necessary conduits, and where they have committed no wrong and have measured up to the duty required of them should be protected by a public policy which will say to him "your very existence will not be jeopardized merely because it is more convenient for the consumer to reach you than the manufacturer," or "that you are in a much better position to put pressure on the one with whom you have dealt."

Under the Griggs case a reputable retail grocer in this state,

although he has committed no wrong, but, on the other hand, has exercised every precaution in selecting manufacturers recognized by the consumer-public as being the best, could be wiped out of business by the sale of one can of peaches, or in this instance, one sealed package of apricot puff cookies. I am not willing to jeopardize the existence of this class of small business men. The law should be written in every case so as to protect the innocent. It would seem to me much more just and equitable to put the burden on the consumer suing the manufacturer who processed the food than it would be to have the class of small business men handling groceries in constant jeopardy of being run out of business. The innocent wholesaler or retailer should not be required to shoulder an unwarranted burden merely for the convenience of the consumer. The entire liability in the instant case should be placed on the manufacturer, where it justly belongs, for the manufacturer had the opportunity and means, and therefore the duty, to insure that no noxious or injurious substances shall get into the sealed package—an opportunity and means which the wholesaler-retailer did not have, and for which he cannot justly be charged.

It is the settled law of this state as established in the Decker & Sons, Inc. case, supra, that liability is imposed on the manufacturer under an implied warranty imposed by operation of law as a matter of public policy. Therefore, the consumer has been given the right to sue the party at fault. This is all he is rightfully entitled to.

The certified question should be answered in the negative.

Opinion delivered July 16, 1952.

Rehearing overruled October 1, 1952.